Filed 1/23/14  P. v. Smith CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063100 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD239290) |
| KEVIN LAMAR SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

George L. Schraer for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Steve Oetting, Andrew Mestman and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Defendant Kevin Lamar Smith appeals from a judgment of conviction after a jury convicted him of one count of pandering and one count of pimping. Smith asserts that in order for his pandering conviction to be upheld, there must be evidence that he encouraged the prostitute with whom he was involved to change her business relationship by ceasing to work as a prostitute for another person and working for him as a prostitute, instead. Smith claims that there is insufficient evidence to support his conviction for pandering because, he contends, the evidence demonstrates that the prostitute in question decided to leave her pimp and form a relationship with him of her own volition and without his inducement or encouragement. Smith also challenges his conviction for pimping, arguing that the trial court prejudicially erred in not instructing the jury with a pinpoint instruction he requested that would have told the jury, in effect, that if it found that the prostitute gave Smith her money for the purpose of holding it for her and not for his support, then the jury would have to find him not guilty of pimping.

We conclude that both of Smith's arguments are meritless. Smith's contention that the evidence is insufficient to support his conviction for pandering is based on a misinterpretation of recent Supreme Court authority concerning the pandering statute. With respect to the trial court's rejection of Smith's proposed pinpoint jury instruction, the trial court appropriately rejected Smith's requested pinpoint instruction because the proffered instruction was ambiguous and provided an incorrect description of the law pertaining to the offense of pimping. We therefore affirm the judgment.

2

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Factual background*

In late January 2012, officers from the Vice Unit of the San Diego Police Department were conducting an undercover "in-call" operation to investigate prostitution in the Hotel Circle area of San Diego. Detective William Kellner, who was participating in the operation, found an online advertisement for an escort who identified herself as "Chilli." Kellner called the number in the advertisement. The woman who answered his call quoted him a price of $140 for an hour and asked him to meet her outside a hotel. Kellner went to the hotel and met "Chilli." Once they were inside a hotel room, "Chilli" agreed to have anal sex with Kellner for $200. "Chilli" took off all of her clothes and asked Kellner to lock the door to the room. At that point, Kellner notified his team to come in. Kellner's team knocked on the door and indicated that they were from the San Diego Police Department.

Detective Luke Johnson entered the hotel room and spoke with "Chilli," who was subsequently identified as Amber H. Amber indicated to Johnson that she was scared and told him about her pimps, including Smith. Johnson looked through the call logs of two of Amber's cell phones and saw several text messages from Smith.

Amber agreed to engage in a pretext telephone call with Smith. During the call, Amber told Smith that she had made "400 boodles." Smith said, "That's great. You had a great night. You had a great night." He then told Amber that he was going to come to the hotel room.

3

Amber told Detective Johnson what Smith looked like and described his car. She also indicated that Smith's normal course of action was to come and pick up money from her when she was finished with a client. She said that Smith would pull into the hotel parking area, drive around the hotel, and park in the last parking spot next to the elevator.

Amber explained to Detective Johnson that Smith had been nice to her when they first met, but that he became violent two or three days after that. Amber described an incident in which Smith choked her because she had not wanted to work but Smith wanted her to put an advertisement on the internet. According to Amber, Smith said that he would beat her if she did not place an online advertisement. In addition, Smith got angry when Amber did not do what he wanted her to do and "when the money d[id]n't match the time." Later, at the police station, Amber told Johnson that Smith was her pimp.

While Johnson was talking with Amber, Detective Vincent Bales set up surveillance at the hotel and waited for Smith to arrive. Officers detained Smith and a female passenger who was with him when he arrived at the hotel. When Detective Johnson called a phone number that was listed as Smith's in Amber's cell phone, a cell phone that police had found in Smith's car rang and identified the caller as "Chilli." The cell phone found in Smith's car contained several photographs of Amber that had been used in her online advertisements for prostitution.

At trial, Amber testified about the events that preceded her arrest. According to Amber, in October 2011, she had been living in an apartment with Louis Leonard, who was her pimp at the time. She was using the internet to advertise herself as a prostitute

4

and was also working on El Cajon Boulevard. Amber's relationship with Leonard began to disintegrate because of "domestic violence issues." Amber had tried to leave Leonard in the past, but he would find her and punish her by having his caregiver, Charles Walser, beat her.[1]

Amber first met Smith when Smith came to Leonard and Amber's apartment to play chess with Walser. In November 2011, Smith's visits to Leonard's and Amber's home increased in frequency. Leonard instructed Amber not to talk with Smith, and advised her to "stay in pocket."[2] At some point, Amber asked Walser for Smith's telephone number, which Walser provided.

In early December 2011, Amber decided to leave Leonard. She packed a few things and used money she had earned one day working as a prostitute to rent a room at a motel. Amber called Smith from the motel and told him that she wanted to see him. Smith came to the motel, and Amber performed oral sex on him. From that point on, Amber wanted to be around Smith as much as possible. She believed that Smith would be able to protect her if Leonard and Walser tried to come after her.

After Amber and Smith met at the motel, Amber continued to work as a prostitute. A few days later, Smith asked her when she was going to start making money. Amber said that she continued to work as a prostitute at that time because she was "attached to the game," and because prostitution was the easiest way for her to earn money. Amber

---

[1]    Leonard had muscular dystrophy and was disabled.

[2]    According to testimony at trial, to be "in pocket" for a prostitute means to remain under the control of a particular pimp and following that pimp's rules.

gave Smith the money she earned from prostitution. According to Amber, she and Smith used the money for car payments, gas, and rent. Amber also said that some of the money was to be saved so that she and Smith could get an apartment. Amber admitted that there were times when Smith would beat her for "[m]oney, attitude, backtalk" and when "the money doesn't match the time."

At some point after Amber began working with Smith as her pimp, Leonard and Walser found Amber and took her back to Leonard's apartment. Amber was pregnant. Walser beat Amber, kicking her and punching her in the stomach. Amber eventually managed to run away from the apartment and called Smith to pick her up. Amber began having complications with her pregnancy. Smith took Amber to the hospital, where she suffered a miscarriage.

Amber was discharged from the hospital in mid-January 2012. Smith picked her up from the hospital. The doctor had told Amber that she should not have sex for two weeks. She followed these instructions for a day or two, but then went back to work. Smith had told her that if she did not make money, she would not have a place to stay. Although Smith told Amber that she had to work, he also said that "ultimately it would still be left up to her." Amber and Smith were arrested later that month.

B.    *Procedural background*

The relevant charging document is a third amended information that charges Smith with one count of pandering by encouraging (Pen. Code, § 266i, subd. (a)(2); count

6

1)[3] and one count of pimping (§ 266h, subd. (a); count 2). The charging document also alleges that Smith had served two prior prison terms within the meaning of section 667.5, subdivision (b), and that he had suffered two prior strike convictions within the meaning of section 667, subdivisions (b) through (i) and sections 1170.12.[4]

A jury found Smith guilty on both counts. In a bifurcated proceeding, the trial court found true the allegations regarding Smith's prior strikes, and also found true one of the allegations that he had served a prior prison term.

The trial court sentenced Smith to a term of four years, doubled pursuant to the three strikes law, on count 1, plus an additional year for the prior prison term findings. The trial court imposed and stayed the middle term of four years on count 2.

Smith filed a timely notice of appeal.

III.

DISCUSSION

A. *There is substantial evidence in the record to support Smith's conviction for pandering*

Smith contends that the evidence is insufficient to support his conviction for pandering by encouraging because, he claims, he did not cause, induce, persuade, or encourage Amber to become a prostitute. Rather, according to Smith, it was Amber who first contacted him and initiated a relationship.

---

[3]    Further statutory references are to the Penal Code unless otherwise indicated.

[4]    The third amended information also charged Leonard and Walser with a number of additional counts. Smith's trial was severed from the trial of his codefendants. Leonard and Walser are not parties to this appeal.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation] '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] '[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' [Citation.]" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1289-1290, fn. omitted.)

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Smith was charged in count 1 with violating section 266i, subdivision (a)(2). Pursuant to this statutory provision, a person is guilty of pandering if he or she "[b]y promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute." (*Ibid*.) The trial court instructed the jury regarding the offense of pandering, based on CALCRIM No. 1151, as follows:

"The defendant is charged in Count 1 with pandering Amber in violation of Penal Code section 266i.

"To prove that the defendant is guilty of pandering, the People must prove that:

"1. The defendant used promises, threats, violence, or any device or scheme to cause, persuade, encourage, or induce Amber to become a prostitute;

"AND

"2. The defendant intended to influence Amber to be a prostitute.

"It does not matter whether Amber was a prostitute already.

"A *prostitute* is a person who engages in sexual intercourse or any lewd act with another person in exchange for money or other compensation. A *lewd act* means physical contact of the genitals, buttocks, or female breast of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal or gratification."

The Supreme Court recently concluded that encouraging a person to "become a prostitute" does not require that the potential target not have previously worked as a prostitute, nor does it require that the defendant have encouraged a "virtuous" woman to change her profession to prostitution. Rather, the statute refers to encouraging the potential victim to " 'become a prostitute' in the future for the benefit of the encourager or some other pimp"—i.e., to engage in future acts of prostitution. (*People v. Zambia* (2011) 51 Cal.4th 965, 975 (*Zambia*).)

In *Zambia*, the court considered the meaning of the phrase, "to become a prostitute" in section 266i, subdivision (a)(2). The defendant in *Zambia* had approached an undercover officer who was posing as a prostitute. Believing that the undercover

9

officer was already a prostitute, the defendant told her that he was a pimp and promised her that if she gave him her money and worked for him, he " 'would take care of [her].' " (*Zambia*, *supra*, 51 Cal.4th at p. 970.) Appealing his conviction for pandering, the defendant argued "that section 266i, subdivision (a)(2)'s phrase 'to become a prostitute' does not include encouraging a person who is already a prostitute, or is posing as one." (*Zambia*, *supra*, at p. 972.) In response, the People argued that " 'to become a prostitute' [in subdivision (a)(2) of section 266i] means to 'engage in any future acts of prostitution,' regardless of the victim's status at the time of a defendant's encouragement." (*Zambia, supra,* at p. 972.)

In affirming the defendant's conviction for pandering, the Supreme Court explained that with a single exception, other courts had rejected the defendant's argument. (*Zambia*, *supra*, 51 Cal.4th at p. 972.) As to the case that presented the "single exception," *People v. Wagner* (2009) 170 Cal.App.4th 499 (*Wagner*), the *Zambia* court dismissed the *Wagner* court's conclusion that section 266i, subdivision (a) excludes "efforts to importune someone currently engaged in that profession to change management." (*Zambia*, *supra*, at p. 976.) The *Zambia* court explained:

> "The language of the pandering statute describes current conduct on the part of the defendant: inducing and encouraging. That current conduct is aimed at producing subsequent conduct by the target: that the target thereafter engage in acts of prostitution following a defendant's inducement or encouragement. To encourage an established prostitute to change her business relationship necessarily implies that a defendant intends a victim 'to become a prostitute' in the future regardless of her current status." (*Zambia*, *supra*, at p. 975.)

10

Smith contends that there is no evidence to demonstrate that he made any promises or threats, or used any device or scheme, to get Amber to become his prostitute. He asserts that "it was Amber who first contacted and initiated a relationship with [him]," and maintains that the record shows something akin to "reverse pandering," whereby Amber was the one who "induced or encouraged appellant to enter into a romantic relationship with her, which also arguably led to a pimp/prostitute relationship." In making this argument, Smith contends that his case does not fit into the pandering model found in *Zambia*, *supra*, 51 Cal.4th at page 975. He states that "Amber was already a prostitute when she first met appellant," and that "[a]ppellant did not encourage Amber to change her business relationship" to be his prostitute. Smith does admit, however, that there is evidence that at some point in time, he "encouraged, caused, persuaded and induced Amber to engage in acts of prostitution." In Smith's view, this is insufficient to support a conviction for pandering. Apparently relying on the *Zambia* court's determination that "encourag[ing] an established prostitute to change her business relationship" would be sufficient to constitute pandering, Smith contends that pandering "applies to the establishment of the relationship, not to its perpetuation." We disagree.

In *Zambia*, *supra*, 51 Cal.4th at page 981, the court concluded that, "the proscribed activity of encouraging someone 'to become a prostitute,' as set forth in section 266i, subdivision (a)(2), includes encouragement of someone who is already an active prostitute, or undercover police officer." Contrary to Smith's position on appeal, the *Zambia* court did not include any requirement that the defendant have encouraged another person *to change his or her business relationship* in order to be considered to

11

have encouraged that person to engage in further acts of prostitution. Although the *Zambia* court ultimately determined that evidence that someone has encouraged an established prostitute to change her business relationship is *sufficient* to establish that the person is guilty of pandering, the *Zambia* court did not hold that the encouragement of a change in a business relationship is *necessary* to establish guilt with respect to the offense of pandering when the defendant's target has already been engaged in acts of prostitution or is an established prostitute. The *Zambia* opinion makes it clear that the conduct targeted by the pandering statute is "inducing and encouraging" someone to "*engage in acts of prostitution*." (*Zambia*, *supra*, at p. 975.) Thus, pursuant to the authority of *Zambia*, anyone who induces or encourages an established prostitute to engage in acts of prostitution in the future may be found guilty of pandering.[5]

There is substantial evidence to support a finding that Smith, by promises, threats, violence, or by any device or scheme, caused, induced, persuaded, or encouraged Amber to engage in acts of prostitution. Specifically, Amber testified that on the day that she and Smith were arrested, she had not wanted to work as a prostitute, but Smith choked

---

[5] The *Zambia* court's approval of *People v. DeLoach* (1989) 207 Cal.App.3d 323 (*DeLoach*) supports this position. In *DeLoach*, the defendant was convicted of two counts of pandering, based on her conduct "causing, inducing, persuading or encouraging her daughter into committing two separate acts of prostitution, by means of separate threats on two separate occasions." (*Id*. at pp. 333-334.) The *DeLoach* court affirmed both convictions, concluding that "[t]he evidence, which shows that appellant twice forced her daughter to perform acts of prostitution against her will, fully supports the jury's conviction of appellant on these charges." (*Id*. at p. 334.)

The *Zambia* court agreed with the *DeLoach* court's assessment of the pandering statute, stating that "[t]he Court of Appeal correctly rejected DeLoach's argument that, because she had coerced S. to act as a prostitute the first time, she was insulated from punishment for pandering the second time." (*Zambia*, *supra*, 51 Cal.4th at p. 975.)

her and told her that he wanted her to post an advertisement on the internet.[6] Amber also testified that on another occasion, she began prostituting herself a day or two after being released from the hospital after suffering a miscarriage because Smith had told her that she would not have a place to stay if she did not continue working as a prostitute.[7] Amber's testimony regarding each of these instances provides sufficient evidence of Smith's pandering. We therefore affirm Smith's conviction on count 1.

B.    *The trial court properly refused to give the pinpoint instruction that Smith requested*

Smith contends that his conviction for pimping in count 2 should be reversed because the trial court erred in refusing to instruct the jury with his proposed pinpoint instruction pertaining to how the money that Amber earned as a prostitute was used.

1.    *Additional background*

Smith was charged with pimping as set out in section 266h, subdivision (a). That statute provides:

> "[A]ny person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution, or from money loaned or advanced to or charged against that person by any keeper or manager or inmate of a house or other place where prostitution is practiced or allowed, or who solicits or receives compensation for soliciting for the person, is guilty of pimping, a felony, and shall be punished by imprisonment in the state prison for three, four, or six years."

---

[6]    Amber also recounted this event to Detective Johnson when he interviewed her on the day of her arrest.

[7]    According to Amber, Smith could stay with his mother, but Amber's only other options, as she viewed them, were living on the street or going back to Leonard.

The trial court instructed the jury with respect to this offense with CALCRIM No. 1150, as follows:

> "The defendant is charged in Count 2 with pimping Amber, in violation of Penal Code section 266h.
>
> "To prove that a defendant is guilty of pimping, the People must prove that:
>
> "1. The defendant knew that Amber was a prostitute;
>
> "AND
>
> "2. The money that Amber earned as a prostitute supported defendant, in whole or in part;
>
> "A *prostitute* is a person who engages in sexual intercourse or any lewd act with another person in exchange for money or other compensation. A *lewd act* means physical contact of the genitals, buttocks, or female breast of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal or gratification."

Smith's attorney requested that the trial court instruct the jury with a pinpoint instruction regarding the second element of the above instruction:

> "If you find that Amber gave or loaned Mr. Smith money that she earned from prostitution, for the purpose of holding, saving or for any other purpose except for the purpose of being supported or maintained by Amber, then it will be your duty to find Mr. Smith . . . not guilty of count 2 Pimping (Pen. Code §266h).
>
> "If you find Mr. Smith accepted money from Amber for purposes other than for his support and maintenance, then it will be your duty to find Mr. Smith . . . not guilty of count 2 Pimping (Pen. Code §266h)."

14

The trial court reviewed the authorities that defense counsel cited and declined to give the instruction to the jury. The trial court indicated that the court believed that other instructions adequately covered the idea at issue in the proffered pinpoint instruction.

2.    *Analysis*

"[L]egally correct and factually warranted pinpoint instructions designed to elaborate and clarify other instructions should be delivered upon request." (*People v. Hughes* (2002) 27 Cal.4th 287, 362, italics omitted.) A trial court errs when it refuses to give such an instruction. (*Ibid.*) However, it naturally follows that "a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30.)

"[A] claim that a court failed to properly instruct on the applicable principles of law is reviewed de novo." (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111; see also *People v. Posey* (2004) 32 Cal.4th 193, 218 [instructional error is reviewed de novo].)

The trial court did not err in refusing to give the pinpoint instruction that Smith requested because that instruction is ambiguous, and one reasonable interpretation of the instruction constitutes an inaccurate statement of the law. Specifically, pursuant to Smith's proposed instruction, if the jury found that some of the money that Amber gave Smith was for the purpose of him holding it or saving it for her, then the jury could find Smith not guilty, even if it determined that other money that Amber gave Smith was for his support and maintenance. Under section 266h, subdivision (a), a person is guilty of pimping if that person knowingly "lives or derives support or maintenance in whole or in

15

part from the earnings or proceeds of [another person's] prostitution." The statute does not require that all of the money that a prostitute gives to her pimp be used *solely* for the purpose of the pimp's support. The CALCRIM instruction that the trial court gave to the jury in this case adequately and correctly identified these elements for the jury. The proposed pinpoint instruction inaccurately implies that if some of the money that Amber gave Smith was for the purpose of him holding it for her, Smith was not guilty of pimping. However, pursuant to the statute, in order to find Smith guilty of pimping, the jury had to determine only that some of the money that Amber earned as a prostitute was used to support Smith. The trial court therefore properly rejected the defense's proffered pinpoint instruction.

IV.

DISPOSITION

The judgment is affirmed.

_____

AARON, J.

WE CONCUR:

_____

BENKE, Acting P. J.

_____

McDONALD, J.

16